MORSE vs. LEVEY, MISC 21-000194

































 
 AMES E. MORSE, Plaintiff, v. ROBERT W. LEVEY, WALTER B. ADAMS, DEREK B. REDGATE, as they are Members of the Wellesley Zoning Board of Appeals, and GRAVESTAR, INC., as Manager of Wellesley Plaza LLC, and State Street Center, LLC, Defendants
 MISC 21-000194 
 OCTOBER 4, 2021
NORFOLK, ss.
ROBERTS, J.
MEMORANDUM OF DECISION ALLOWING DEFENDANT GRAVESTAR, INC.'S RULE 12(b)(1) AND RULE 56 MOTIONS














 INTRODUCTION 





 Plaintiff James E. Morse ("Mr. Morse") commenced this G. L. c. 40, § 17, appeal with the filing of a complaint on April 6, 2021 in which Mr. Morse sought to annul the March 18, 2021 decision ("the Decision") of the town of Wellesley ("the Town") zoning board of appeals ("the ZBA") granting defendant Gravestar, Inc. ("Gravestar") a site plan approval permit. By motion allowed on August 20, 2021, Mr. Morse was permitted to file an amended complaint ("the Amended Complaint") that further sought a remand of this matter to the ZBA "to render a decision consistent with the findings of this court." On July 12, 2021, Gravestar filed Gravestar's Rule 12(B)(1) And Rule 56 Dispositive Motions ("the Motions"), in which Gravestar contended that Mr. Morse lacked standing to pursue this appeal and that, on the merits, Gravestar was entitled to judgment upholding the Decision on the undisputed facts as a matter of law. The Motions were fully briefed and a hearing was held by videoconference on September 16, 2021. For the reasons set forth below, the Motions are ALLOWED. 





UNDISPUTED FACTS 





 The following facts established in the record are undisputed or are deemed admitted. 





The Properties 





 1. Gravestar is the manager of Wellesley Plaza LLC ("WP LLC") and State Street Center LLC ("SSC LLC"). Amended Complaint ¶ 10. 





 2. According to the records available in the Town's assessors' on-line database, WP LLC is the owner of 442-452 Washington Street, on the corner of Washington Street and State Street, the lessee from the Town of the abutting 8 State Street to the east, and the owner of the abutting 10 State Street to the east of 8 State Street. 





 3. 442-452 Washington Street contains two one-story buildings housing retail establishments, including a Whole Foods Market. Gravestar's Appendix, Ex. 1C, Decision at 2. 





 4. 8 State Street and 10 State Street are parking lots. Gravestar's Appendix, Ex. 1C, Decision at 2. 





 5. According to the Town's assessors' on-line database, SSC LLC is the owner of 16 State Street, which abuts 10 State Street to the east, and 24 State Street, which abuts 16 State Street to the east. 





 6. 16 State Street contains a two-family dwelling. Gravestar's Appendix, Ex. 1C, Decision at 2. 





 7. Mr. Morse and his wife, Ana M. Morse, are the owners of 55 Atwood Street, Wellesley ("the Morse Property") by virtue of a deed filed with the Norfolk Registry District as Doc. No. 1,349,541 on March 22, 2016. [Note 1] 





 8. Exhibit E to the Affidavit Of James E. Morse, sworn to on August 10, 2021 ("Morse Aff."), James E. Morse's Appendix, Ex. 5, shows the Morse Property as being served by one driveway off of State Street, which still services the Morse Property. Gravestar's Appendix, Ex. 2, Deposition of James E. Morse dated June 7, 2021 ("Morse Dep.") at 17. 





 9. As had been his intent since acquiring the Morse Property in 2016, Morse Aff. at ¶¶ 6-9, Mr. Morse constructed a second driveway to service the Morse Property in 2020, this one located off of Atwood Street and constructed after Mr. Morse learned of Gravestar's application to the ZBA ("the Application"). Combined Concise Statement Of Facts ("SOF") ¶ 18. 





The Project 





 10. In the Application, Gravestar sought a site plan approval permit to demolish the two family dwelling on 16 State Street, to renovate its parking lot on 10 State Street, and to expand its parking lot onto 16 State Street (10 State Street and 16 State Street are referred to hereinafter as "the Site" and the proposed work is referred to as "the Project"). Gravestar's Appendix, Ex. 1C, Decision at 1. 





 11. Mr. Morse does not object to the Project in its entirety, but does object to the relocation of the driveway at the Site from its existing location to a location approximately 100 feet to the east, at the intersection of State Street and Atwood Street. SOF ¶ 17; Morse Dep. at 45. 





 12. At present, the entrance to the Site from State Street and the intersection of Atwood Street and State Street are both three-way intersections located within 100 feet of each other. SOF ¶ 5; Gravestar's Appendix, Ex. 1C, Decision at 2. 





 13. Gravestar proposes to relocate the entrance to the Site to form a four-way intersection at Atwood Street. Gravestar's Appendix, Ex. 1C, Decision at 2. 





Facts Relevant To Mr. Morse's Standing 





 14. The Morse Property is located across State Street from 24 State Street. SOF ¶ 26. 





 15. 24 State Street is owned by SSC LLC and contains a residential building, but is not part of the Project or Site. SOF ¶ 26. 





 16. Neither the Whole Foods building nor its use are changing or expanding, and no additional vehicle trips are expected as a result of this Project. SOF ¶ 8. 





 17. The Morse Property does not currently get blocked by traffic on Atwood Street. SOF ¶ 19. 





 18. According to the unrebutted testimony of Robert J. Michaud, P.E. ("Mr. Michaud"), MDM Transportation Consultants, Inc.'s ("MDM"), president and managing principal, "[b]ased on traffic engineering principles, the new design should be neutral when it comes to Morse accessing his driveway." Gravestar's Appendix, Ex. 1, Affidavit Of Robert J. Michaud, P.E., sworn to on July 12, 2021 ("Michaud Aff."), ¶ 14. 





 19. At the hearing on the Motions, counsel for Mr. Morse confirmed that Mr. Morse relies on Table 4 and Table 5 of the October 24, 2019 traffic impact assessment ("the TIA") prepared by Gravestar's expert, MDM, contained in Gravestar's Appendix at Ex. 1, Tab A, to establish Mr. Morse's injury. 





 20. Table 4, Intersection Capacity Analysis Results Weekday Morning Peak Hour, shows the level of service ("LOS") [Note 2] at the intersection of State Street and the Site entrance as B at the southbound exit with an average control delay per vehicle of 13 seconds, and the LOS at the intersection of State Street and Atwood Street as B at the northbound exit with an average control delay per vehicle of 14 seconds. Gravestar's Appendix, Ex. 1, Tab A, TIA at 12. 





 21. After relocation of the Site entrance to Atwood Street, Table 4 shows no data for the prior Site entrance, which will no longer exist, and at the proposed Atwood Street and Site entrance, a LOS of C at the northbound exit and an average control delay per vehicle of 20 seconds and, at the southbound exit, a LOS of B with an average control delay per vehicle of 14 seconds. Gravestar's Appendix, Ex. 1, Tab A, TIA at 12. 





 22. Table 5, Intersection Capacity Analysis Results Weekday Evening Peak Hour, shows the LOS at the intersection of State Street and the Site entrance as C at the southbound exit with an average control delay per vehicle of 16 seconds, and the LOS at the intersection of State Street and Atwood Street as B at the northbound exit with an average control delay per vehicle of 13 seconds. Gravestar's Appendix, Ex. 1, Tab A, TIA at 13. 





 23. After relocation of the Site entrance to Atwood Street, Table 5 shows no data for the prior Site entrance, and at the proposed Atwood Street and Site entrance, a LOS of C at the northbound exit and an average control delay per vehicle of 20 seconds and, at the southbound exit, a LOS of C with an average control delay per vehicle of 18 seconds. Gravestar's Appendix, Ex. 1, Tab A, TIA at 13. 





 24. According to Mr. Michaud, MDM's traffic assessment was based on weekday, not weekend, peak travel times "because the weekday volumes along public ways represent the highest level of traffic activity during the week and hence represent the appropriate 'design period' for analysis and design purposes." Gravestar's Appendix, Ex. 1, Michaud Aff. at ¶ 7. 





 25. MDM's summation of the information contained in Table 4 and Table 5 is that "[t]he proposed site driveway approach to State Street will continue to operate below capacity at LOS C or better during the peak hours. Mainline operation along State Street will remain unimpeded and operated at LOS A or better during the peak hours. In summary, no material change in operations is anticipated." Gravestar's Appendix, Ex. 1, Tab A, TIA at 14. 





 26. According to Mr. Morse's expert, the proposed relocation of the Site entrance "would increase the number of conflict points concentrated in the State Street/Atwood Street intersection, particularly affecting residents of Atwood Street" and would "lower [the] level of service and increase delays on the Atwood Street approach to State Street, particularly affecting residents of Atwood Street especially the very proximate [Morse Property]." James E. Morse's Appendix, Ex. 4, Affidavit Of Kim Eric Hazarvartian, Ph.D., P.E., PTOE, sworn to on August 5, 2021 ("Hazarvartian Aff."), at ¶¶ 15-16. 





 27. According to Mr. Michaud, "the safety analysis is more complicated than just adding up 'conflict points' as Morse tries to do. Good traffic engineering takes into account how the conflict points relate to each other." Gravestar's Appendix, Ex. 1, Michaud Aff. at ¶ 10. 





Facts Relevant To The Merits Of Mr. Morse's Appeal 





 28. Gravestar filed the Application under Section 16A of the Town's zoning bylaw ("the ZBL") on June 11, 2019. SOF ¶ 9. 





 29. The Project, a proposed parking lot expansion, is an allowed use and meets the Town's dimensional zoning requirements. SOF ¶ 9. 





 30. The ZBA held five public hearings on the Application between August 8, 2019 and December 10, 2020, a schedule dictated in part by the COVID-19 pandemic. SOF ¶ 10. 





 31. MDM's recommendations and reports were peer reviewed by Environmental Partners. SOF ¶ 11. 





 32. MDM's traffic assessment identified the existence of the two three-way intersections at the Site entrance and at Atwood Street within 100 feet of each other as an issue: "The configuration requires drivers going between the Whole Foods parking lot and Atwood Street to do a quick jog to make those two close turns. The close proximity of intersections complicates driving maneuvers by introducing multiple maneuvering 'decision points' between the intersections that must be negotiated in a relatively short distance." Gravestar's Appendix, Ex. 1, Michaud Aff. at ¶ 10. 





 33. The Institute of Transportation Engineers recommends that consecutive three-way intersections either be combined into a single four-way intersection as proposed by Gravestar or be separated by more than 200 feet, which would push the Site entrance closer to the intersection with Washington Street, from which traffic queues already block the existing Site entrance. Gravestar's Appendix, Ex. 1, Michaud Aff. at ¶¶ 8, 10-11; SOF ¶ 4. 





 34. In its peer review of MDM's work, Environmental Partners reported to the ZBA that "[s]tandard engineering practice encourages the design of a four-way intersection where feasible rather than two offset three-way or 'T-type' intersections." Gravestar's Appendix, Ex. 1, Michaud Aff. at ¶ 10.





 35. After its review, Environmental Partners opined that "the proposed design provides an improvement in traffic operations along State Street." SOF ¶ 12. 





 36. In its Decision, the ZBA imposed twenty-one conditions, the last of which requires Gravestar to contribute to a traffic analysis fund. SOF ¶ 13. 





 37. Among its reasons for approving Gravestar's site plan, the ZBA found that the proposed redesign of the Site entrance "(1) reduced crash risk for traffic movements along State Street; (2) improves traffic operations; and (3) provides geometry that meets appropriate safety-based sight line criteria and vehicle maneuvering requirements." SOF ¶ 14. 





 38. In its Decision, the ZBA stated: 





 The Board acknowledges that a three-way intersection has fewer conflict points than a four-way intersection. But the Board believes that the safety of the proposed relocated four-way driveway is impacted by more than simply a single variable. The traffic professionals considered five different variables in conjunction with the relocation of the driveway and concluded that the proposed driveway relocation is an improvement over the existing conditions. The Board has accepted that view. Gravestar's Appendix, Ex. 1C, Decision at 11. 





Relevant Provisions of the ZBL 





 Section 16A. Project Approval 





 A. Scope and Purpose 





 Minor Construction Projects (as herein defined) and Major Construction Projects (as herein defined) are subject to comprehensive review in accordance with the terms of this section. ... 





 This section shall be interpreted so as to: 





 1. Ensure compliance with the Zoning Bylaws of the Town of Wellesley; 





 2. Protect the safety, convenience and welfare of the public; 





 3. Minimize additional congestion in public and private ways; 





 ... 





 5. Ensure compliance with the provisions of Section 16; 





 6. Ensure compliance with the provisions of Section 21; and 





 7. Ensure compliance with the provisions of Section 22. 





 ... 





 C. Applicability and Procedure





 ... 





 2. Site Plan Review 





 In addition to Design Review in accordance with the preceding section, Major Construction Projects and Projects of Significant Impact are subject to Site Plan Review, as follows: 





 a. The applicant shall submit to the Zoning Board of Appeals ("ZBA") plans and other submission materials in accordance with the procedures for Special Permits adopted by the ZBA pursuant to Section 25 of this Zoning Bylaw. Within seven (7) days from the date of its submission to the ZBA, copies of the complete application as submitted shall be referred by the ZBA to the Board of Health, Planning Board, Design Review Board, Town Engineer, Wetlands Protection Committee, Municipal Light Plant, Fire Chief, Police Chief and any other Town agencies or boards designated by the ZBA, for review and preparation of written recommendations to the ZBA, Building Inspector and the applicant prior to the required public hearing. Said written recommendations shall be attached to and become part of the application. 





 b. No decision shall be made by the ZBA in connection with any application until the above referenced written recommendations have been received or thirty-five (35) days shall have elapsed after such referral of the application without a recommendation being received. The ZBA may modify such plans to meet the requirements of this Section, and as modified, approve the same, or may disapprove the plans. No building permit or parking permit shall be issued by the Building Inspector without the written approval of plans as herein above provided. 





 Section 21. Off-Street Parking 





 ... 





 D. Regulations and Restrictions 





 ... 





 3. Development Standards 





 Each parking area hereafter devoted to the off-street parking of fifteen (15) or more vehicles regardless of whether said parking area is required by this Bylaw, shall comply with the standards as hereinafter set forth: 





 ...





 b. The number of driveways permitting entrance to and for exit from a lot shall be limited to two per street line. Driveways shall be located so as to minimize conflict with traffic on public streets and where good visibility and sight distances are available to observe approaching pedestrian and vehicular traffic. 





 Section 25. Special Permit Granting Authority 





 A. General Authority and Conditions 





 This Zoning Bylaw provides for specific types of uses which shall only be permitted in specified districts upon the granting of a special permit, as provided herein. Special permits may be granted only for uses which are in harmony with the general purpose and intent of this Zoning Bylaw, and shall be subject to general or specific provisions as set forth herein, and such permits may also impose conditions, safeguards, and limitations on time or use, in order to further the objectives of this Zoning Bylaw. 





 B. Specific Powers 





 ... 





 3. Project Approval 





 The Special Permit Granting Authority is empowered to review and approve plans in accordance with the requirements of Section 16A and this Section 25. The provisions of Section 25.C. of this section shall apply to the review and approval of plans for Major Construction Projects as defined in Section 16A of this Zoning Bylaw. The approval of plans by the Special Permit Granting Authority in accordance with Section 16A shall constitute the granting of a special permit. 





STANDARD OF REVIEW 





 With respect to Gravestar's motion brought pursuant to Mass. R. Civ. P. 12 (b) (1), the court "accept[s] the factual allegations in the plaintiffs' complaint, as well as any favorable inferences reasonably drawn from them, as true." Sullivan v. Chief Justice for Admin. & Mgmt. of the Trial Court, 448 Mass. 15 , 21-22 (2006) (quotation and citations omitted). The court may also consider affidavits and other exhibits. Massachusetts State Auto. Dealers Ass'n, Inc. v. Tesla Motors MA, Inc., 469 Mass. 675 , 677 n. 8 (2014) ("A judge ruling on a motion to dismiss for lack of standing pursuant to Mass. R. Civ. P. 12 (b) (1), 365 Mass. 754 (1974), may properly consider such submissions."). "A motion to dismiss will be granted only where it appears with certainty that the nonmoving party is not entitled to relief under any combination of facts that he could prove in support of his claims." Sullivan, 448 Mass. at 21 (citations omitted). 





 With respect to Gravestar's motion brought pursuant to Mass. R. Civ. P. 56, summary judgment may be entered if the "pleadings, depositions, answers to interrogatories, and responses to requests for admission ... together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Mass. R. Civ. P. 56 (c). In viewing the factual record presented as part of the motion, the court draws "all logically permissible inferences" from the facts in favor of the non-moving party. Willitts v. Roman Catholic Archbishop of Boston, 411 Mass. 202 , 203 (1991). "'Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.'" Green Mountain Ins. Co., v. Wakelin, 484 Mass. 222 , 226 (2020), quoting Boazova v. Safety Ins. Co., 462 Mass. 346 , 350 (2012). 





ANALYSIS 





Standing 





 Section 17 of G. L. c. 40A ("the Zoning Act"), allows "[a]ny person aggrieved" by a decision of a special permit granting authority to appeal to, among others, this court. "'Aggrieved person' status is a jurisdictional prerequisite. Unless brought by a municipal officer or board, a court has jurisdiction to consider a zoning appeal only if it is taken by an aggrieved person." Barvenik v. Board of Alderman of Newton, 33 Mass. App. Ct. 129 , 131 (1992). Accord Styller v. Zoning Bd. of Appeals of Lynnfield, 487 Mass. 588 , 592 (2021) ("Standing to challenge a decision of the board, pursuant to G. L. c. 40A, § 17, is a prerequisite to the Land Court's exercise of jurisdiction."). Courts have described a person aggrieved as one who "suffers some infringement of his legal rights," [Note 3] who has "a plausible claim of a definite violation of a private right, a private property interest, or a private legal interest" which right or interest is "one that the statute under which a plaintiff claims aggrievement intends to protect." Standerwick v. Zoning Bd. of Appeals of Andover, 447 Mass. 20 , 27-28 (2006) (citations omitted). "To qualify for that limited class, a plaintiff must establish -- by direct facts and not by speculative personal opinion - - that his injury is special and different from the concerns of the rest of the community." Barvenik, 33 Mass. App. Ct. at 132. "The injury must be more than speculative." Sweenie, 451 Mass. at 543, citing Marashlian, 421 Mass. at 723. "Aggrievement" is not defined narrowly, 81 Spooner Rd., LLC, 461 Mass. at 700, citing Marashlian, 421 Mass. at 721, but "'[a]ggrievement requires a showing of more than minimal or slightly appreciable harm.'" 81 Spooner Rd., LLC, supra, quoting Kenner, 459 Mass. at 121 and cases cited. 





 While "[a]butters entitled to notice of zoning board of appeals hearings enjoy a rebuttable presumption [that] they are 'persons aggrieved,'" Marashlian, 421 Mass. at 721, citing Watros v. Greater Lynn Mental Health & Retardation Ass'n, 421 Mass. 106 , 111 (1995) and Marotta v. Board of Appeals of Revere, 336 Mass. 199 , 204 (1957), Mr. Morse, whose property is diagonally across State Street from the Site, does not have the benefit of that presumption. See Lowell v. Marquis, 16 LCR 205 (2008) (Long, J.) (plaintiff owner of property diagonally across the street is not an abutter or abutter to an abutter and therefore does not benefit from the presumption); Roderick v. Zoning Bd. of Appeals of Truro, 2006 Mass. Super. LEXIS 143 (plaintiff owner of property across a public way and one full lot east of the subject property did not benefit from the presumption). 





 Mr. Morse does carry the burden of proof on the issue of his standing. Standerwick, 447 Mass. at 34 n. 20 ("[T]he plaintiff always bears the burden of proof on the issue of standing. An abutter's presumption of standing simply shifts to the defendant the burden of going forward with the evidence."). To meet that burden, Mr. Morse must put forward "credible evidence" to substantiate his claim of injury. Butler v. City of Waltham, 63 Mass. App. Ct. 435 , 441 (2005). 





 "[C]redible evidence" has both a quantitative and a qualitative component. ... Quantitively, the evidence must provide specific factual support for each of the claims of particularized injury the plaintiff has made. Qualitatively, the evidence must be of a type on which a reasonable person could rely to conclude that the claimed injury likely will flow from the board's action. 





Id. (citations omitted). There is no evidence that Mr. Morse will suffer any injury, let alone the "credible evidence" described in Butler. Instead, as the unrebutted evidence from Mr. Michaud establishes, see 81 Spooner Rd., LLC, 461 Mass. at 702 ("the defendant may present affidavits of experts establishing that an abutter's allegations of harm are unfounded or de minimis"), "no material change in operations is anticipated" at the reconfigured Site entrance and, "[b]ased on traffic engineering principles, the new design should be neutral when it comes to Morse accessing his driveway." Even crediting Mr. Hazarvartian's statements that Mr. Morse, along with his neighbors (and so not specific to Mr. Morse), will be affected by increased conflict points, increased delays and decreased LOS, Gravestar's unrebutted evidence is that those impacts are negligible. According to MDM's TIA, delays at the reconfigured Site entrance will increase by no more than six seconds and the "approach ... will continue to operate below capacity at LOS C or better during peak hours." 





The Merits Of Mr. Morse's Appeal [Note 4] 





 In the Amended Complaint, Mr. Morse seeks an order from this Court annulling the Decision and remanding the matter to the ZBA for reconsideration consistent with the findings of the court. Rather than take issue with any of the particular conditions imposed by the ZBA, Mr. Morse instead challenges the ZBA's approval of the Site entrance relocation. The law related to site plan review, as summarized in Muldoon v. Planning Bd. of Marblehead, 72 Mass. App. Ct. 372 , 373 (2008), is as follows: 





 Although not expressly provided by statute, site plan review is recognized as a permissible regulatory tool and a means for communities to control the aesthetics and environmental impacts of land use under their zoning by-law. See Osberg v. Planning Bd. of Sturbridge, 44 Mass. App. Ct. 56 , 57, 687 N.E.2d 1274 (1997). Site plan review has to do with the regulation of permitted uses, not their prohibition. See id. at 57-59. "[I]f the specific area and use criteria stated in the by-law [are] satisfied, the board [does] not have discretionary power to deny ... [approval], but instead [is] limited to imposing reasonable terms and conditions on the proposed use." Prudential Ins. Co. of Am. v. Board of Appeals of Westwood, 23 Mass. App. Ct. at 281-282, quoting from SCIT, Inc. v. Planning Bd. of Braintree, 19 Mass. App. Ct. 101 , 105 n. 12, 106, 472 N.E.2d 269 (1984). 





 Prudential Ins. Co. of Am. v. Board of Appeals of Westwood, 23 Mass. App. Ct. 278 (1986), cited by Muldoon, addresses the role of the court in reviewing the local board's site plan review decision. "Such a review proceeds in accordance with the well-established principles governing judicial review under G. L. c. 40A, § 17." Prudential, 23 Mass. App. Ct. at 282. The matter is heard de novo, and the "'judge ... is to ... determine the legal validity of the decision of the board upon the facts found by him ....'". Id. at 282 n. 7, quoting Lawrence v. Board of Appeals of Lynn, 336 Mass. 87 , 89 (1957). Although the issue before the Prudential court involved the denial of a site plan approval application, not its approval, its description of the analysis to be undertaken is useful: 





 As the issue involves approval of a site plan for a use permitted as of right, the judge inquires whether (in the language of § 10A[e] of the Westwood by-law) the public interest can be protected "to a degree consistent with the reasonable use of the site for the uses permitted . . . in A-R-O districts." The leading case on site approval, in these circumstances, Y.D. Dugout, Inc. v. Board of Appeals of Canton, 357 Mass. 25 (1970), makes clear (at 31), that this language imposes "regulation of a use rather than its prohibition." Thus, the judge was not required, as he would have been if a special permit had been in issue, simply to ascertain whether there was "sufficient basis to warrant [the board's] decision." Humble Oil & Ref. Co. v. Board of Appeals of Amherst, 360 Mass. 604 , 606 (1971). Nor was his analysis confined by the principle that "[i]t is the board's evaluation of the seriousness of the problem, not the judge's, which is controlling." Copley v. Board of Appeals of Canton, 1 Mass. App. Ct. 821 (1973). See Subaru of New England, Inc. v. Board of Appeals of Canton, 8 Mass. App. Ct. 483 , 486-488 (1979). The judge was essentially to examine the proposal to see if the traffic problem was so intractable that it could admit of no reasonable solution. Short of independently finding that, he was not obliged to give deference to the board's decision. 





Prudential, 23 Mass. App. Ct. at 282-283 (footnote omitted). As an additional ground for denial, the Prudential court noted that "[a] board may lawfully reject a site plan that fails to furnish adequate information on the various considerations imposed by the by-law as conditions of the approval of the plan." Id. at 283 n. 9. 





 As applied to this case, the parties agree that Gravestar's proposed parking lot expansion is an allowed use and meets the Town's dimensional zoning requirements. Accordingly, the ZBA could not deny the Application unless either the "problem," here the location of the Site entrance, "was so intractable that it could admit of no reasonable solution" or Gravestar failed to furnish adequate information on the various considerations imposed by the bylaw. The solution proposed by MDM, that the Site entrance be relocated to the Atwood Street intersection and that two three-way intersections be combined into a single four-way intersection, was, according to the ZBA's own consultant, in accordance with standard engineering practice and "provide[d] an improvement in traffic operations along State Street." Even Mr. Morse's traffic expert finds no fault with the Site entrance relocation: "The proposed driveway relocation is a matter of preference, or opinion, rather than being an engineering requirement." Hazarvartian Aff. ¶ 8. It was a reasonable solution, and therefore the ZBA could not deny the Application based on the relocation of the Site entrance. In addition, the ZBA had adequate information on which to base its decision regarding that issue, considering what was submitted to it by MDM and Environmental Partners (it bears noting that nearly five full pages of the twenty-two page Decision are devoted to listing the materials submitted to the ZBA by the applicant and others). Although Mr. Morse suggests that weekend, rather than weekday, traffic should have been studied, he did not rebut Mr. Michaud's sworn statement that weekday traffic volumes represented the highest level of traffic during the week and were the appropriate design period for analysis and design purposes. Mr. Morse's appeal therefore fails on the merits. 





CONCLUSION 





 For the reasons set forth above, judgment will issue dismissing the Amended Complaint with prejudice and affirming the Decision of the ZBA. 





 SO ORDERED. 





FOOTNOTES
[Note 1] The court takes judicial notice of the records available at the Norfolk County Registry of Deeds and the Norfolk County Registry District. See Mass. G. Evid. § 201. 

[Note 2] There are six LOS designations in the TIA ranging from LOS A to LOS F, with LOS A signifying the least delay and LOS F signifying delays greater than 50 seconds. Gravestar's Appendix, Ex. 1, Tab A, TIA at 12. 

[Note 3] Marashlian v. Zoning Bd. of Appeals of Newburyport, 421 Mass. 719 , 721 (1996), quoting Circle Lounge & Grille, Inc. v. Board of Appeal of Boston, 324 Mass. 427 , 430 (1949). Accord Picard v. Zoning Bd. of Appeals of Westminster, 474 Mass. 570 , 572 (2016); 81 Spooner Rd., LLC v. Zoning Bd. of Appeals of Brookline, 461 Mass. 692 , 700 (2012); Kenner v. Zoning Bd. of Appeals of Chatham, 459 Mass. 115 , 117 (2011); Sweenie v. A.L. Prime Energy Consultants, 451 Mass. 539 , 543 (2008). 

[Note 4] Although the determination that Mr. Morse lacks standing deprives this court of jurisdiction, it will nevertheless consider Gravestar's summary judgment motion should the jurisdictional issue be reversed on appeal. 


 
 Home/Search 
 Land Cases by Docket Number
 Land Cases by Date 
 Land Cases by Name
 


 Commonwealth of Massachusetts. Trial Court Law Libraries. Questions about legal information? Contact Reference Librarians.